IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 8, 2020

**THOMAS MITCHELL v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-06257    Carolyn Wade Blackett, Judge**

_____

**No. W2019-01092-CCA-R3-PC**

_____

The Petitioner, Thomas Mitchell, appeals from the Shelby County Criminal Court's denial of his petition for post-conviction relief from his conviction for burglary, for which he is serving a ten-year, Range III sentence. He contends that the post-conviction court erred in denying relief on his ineffective assistance of counsel claims that (1) counsel failed to object and to request a mistrial when a witness testified that a police officer knew the Petitioner by name, (2) counsel failed to impeach a witness with prior inconsistent statements, (3) counsel failed to call a police officer as a witness, (4) counsel stated in closing argument that a witness had given a statement to the police in which the witness said the Petitioner entered one of the buildings from which the Petitioner was alleged to have removed wiring, (5) counsel failed to state explicitly in closing argument that the jury should consider lesser included offenses, and (6) the cumulative effect of counsel's deficient performance in multiple instances deprived the Petitioner of the effective assistance of counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Lance R. Chism (on appeal and at hearing) and Brandi Heiden (at hearing), Memphis, Tennessee, for the Appellant, Thomas Mitchell.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; Sara Poe, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Petitioner's conviction relates to his entering a commercial building and cutting and pulling wiring from it. At his trial, the Petitioner contended that he was not guilty of burglary because he never entered a building. The jury rejected his defense, and this court affirmed the sufficiency of the conviction on appeal. *See State v. Thomas Mitchell*, No. W2014-02515-CCA-R3-CD, 2015 WL 7509923, at *1-2 (Tenn. Crim. App. Nov. 24, 2015), *perm. app. denied* (Tenn. Mar. 23, 2016).

The Petitioner filed a petition for post-conviction relief and amended petitions. As relevant to this appeal, he alleged that he received the ineffective assistance of trial counsel. The post-conviction court conducted several evidentiary hearings over the course of approximately fourteen months. We will refer to them collectively as "the hearing."

At the post-conviction hearing, Timothy Irwin, Sr., the owner of Zip Products, testified that his son, whom other evidence showed was Timothy Irwin, Jr., had worked for Zip Products for ten to twelve years and sometimes trained new employees. Mr. Irwin, Sr. said Michael Crawford was also employed with the company. Mr. Irwin, Sr. said that the company employed about fifteen people in 2013 and that Mr. Irwin, Jr. and Mr. Crawford interacted with the employees daily. Mr. Irwin, Sr. said he did most of the company's hiring. He did not recall the Petitioner's ever having been employed as a forklift operator but said the Petitioner claimed to be a former employee "at the time we apprehended him." Mr. Irwin, Sr. did not recall having "held" the Petitioner's job while the Petitioner served time at the workhouse, but he acknowledged it could have happened. He identified payroll records dating back to November 1999 and said the Petitioner's name did not appear as having been an employee. He said he had not provided payroll records for March 2003 through March 2004 because he could not recall the name of the payroll processing company the business had used during that time. He acknowledged that the Petitioner might have been employed with an alias name.

Mr. Irwin, Sr. did not recall an incident in which the Petitioner was caught sleeping between Buildings 2 and 3 on Zip Products property. Mr. Irwin, Sr. said that a person slept on the "middle of the street" near the business on an occasion and that "we thought it was him after the fact."

Mr. Irwin, Sr. testified that Building 3 had been used as a warehouse but that it had been demolished after the incident involving the Petitioner because business personnel found evidence that unauthorized people had been in the building. Mr. Irwin, Sr. said he had a large insurance claim due to theft of "heavy stuff" that had been stored in Building 3. He said business personnel found items belonging to the business "in the pile of scrap down the street" at a scrap yard. He said that before the incident involving

-2-

the Petitioner, business personnel had installed "game" cameras on the business's property. He said that the cameras sent images to business personnel's cell phones and that they used the information to catch people attempting to come onto the property.

Relative to the events underlying the Petitioner's conviction, Mr. Irwin, Sr. testified that he, Mr. Irwin, Jr. and Mr. Crawford were in the lunch room when they received cell phone alerts about an intruder. Mr. Irwin, Sr. said they surrounded the building "waiting for him to come out." He said Mr. Irwin, Jr. and Mr. Crawford apprehended the Petitioner "coming out of the building." He agreed "[t]here was a break in and some wire was being stolen" and that the removal of the wire caused damage. He thought when he saw the Petitioner on the date of the incident that he recognized the Petitioner's face as an employee of a nearby business. He said, however, that the business owner said the Petitioner had not worked for the business.

The Petitioner testified that he told trial counsel that he had been employed by Zip Products. He said he told her immediately after she was appointed to represent him about his former employment and that he thought they were "framing" him. He said that he asked her to use this as a basis for the defense but that she told him the State would not "buy it." He said she did not formulate a defense around his theory.

The Petitioner testified that he told trial counsel he had been sleeping in an alley between Buildings 2 and 3 on the date of the incident. He said he told her that he woke around 11:00 a.m. and was getting ready to leave. He said that while he was "gathering up everything and getting reading to leave" Mr. Irwin, Jr. and Mr. Crawford "surrounded" him. The Petitioner said the men confronted him in the alley and told him to drop the bag of clothes he held. He said Mr. Irwin, Jr. held a gun on him. The Petitioner said Mr. Crawford threatened to shoot him. He said Mr. Crawford stated, "[T]hat's all y'all do is go around [here] and break in white folks['] homes when we're not there." The Petitioner said Mr. Crawford called him a racial epithet.

The Petitioner testified that Mr. Irwin, Jr. picked up a pair of rusty bolt cutters that had been on the ground. The Petitioner said the bolt cutters appeared to have been there for a long time because they left an impression in the ground when Mr. Irwin, Jr. picked them up. The Petitioner said that Mr. Irwin, Jr. took him into Building 3, that Mr. Irwin, Jr. left, and that Mr. Crawford held the gun on the Petitioner. The Petitioner said he was "charged with the bolt cutters."

The Petitioner testified that the jury never got to hear his side of the story. He said that if he had testified at the trial, he could have explained how he had been framed.

The Petitioner testified that he knew Mr. Irwin, Sr. "real well" and that he worked for Mr. Irwin, Sr. for six or seven years beginning around 1999 or 2000. He said that

during his employment, he drove a forklift that brought "dyes" to Mr. Crawford, who was the shop manager. The Petitioner said he and Mr. Crawford interacted daily. The Petitioner said he saw Mr. Irwin, Jr. but did not interact with him regularly during the Petitioner's employment. The Petitioner said that "he could tell" Mr. Irwin, Jr. was racist and that Mr. Irwin, Jr. "caught [him] a couple of times in the alleyway" before the September 9, 2013 incident that led to the Petitioner's conviction. The Petitioner later said that only one prior incident occurred. The Petitioner said that Mr. Irwin, Jr. told the Petitioner to stay away, that Mr. Irwin, Jr. would have the Petitioner arrested if he returned, and that the Petitioner had returned.

The Petitioner acknowledged prior convictions for burglary and receiving stolen property. He agreed he had been arrested under the name Darien Mitchell. He said he had an unspecified "record" with the name Darrell Mitchell that "[t]hey just put . . . on the record" which he never tried to change.

The Petitioner testified that he was homeless on September 9, 2013, and that he kept and changed his clothes between Buildings 2 and 3. He said that after he changed clothes between the buildings, he left. He said he provided this information to trial counsel.

The Petitioner testified that he drew trial counsel a diagram of the scene. He said he wrote letters asking if she had investigated or taken photographs of the scene but that she never responded. He identified the drawing he had provided to counsel and agreed counsel offered it as a trial exhibit. He said that some information on the exhibit she tendered at the trial had been "[w]hited out or whatever." He said counsel did not offer any other exhibits related to the crime scene at the trial. He did not think the State had introduced exhibits depicting the scene. He said that no photographs were used at the trial to show how he entered or exited the building and that the only photograph showed him standing in the alley.

The Petitioner testified that he told trial counsel that Mr. Irwin, Jr. picked up the bolt cutters. The Petitioner said he asked counsel to investigate the condition of the bolt cutters in order to show that they were rusty and would not work. He said that he wanted her to present fingerprint evidence to show that the gloves that had been recovered were not his but that she did not. He said counsel never notified him that she had reviewed the physical evidence.

The Petitioner testified that he did not receive the discovery materials until after his trial. He said trial counsel never reviewed the discovery materials with him. He said counsel mailed the discovery materials to him after he filed a complaint against her with the Board of Professional Responsibility.

-4-

The Petitioner testified that trial counsel advised him of a three-year, Range I plea offer. He said she did not tell him that the State's evidence was strong and did not say he should take the offer. He later said counsel never discussed any trial strategy with him and that her only strategy was "trying to get me to plead guilty to the three years that the State was offering me." At this point, the Petitioner stated that recommended he accept the offer. The Petitioner said she never advised him regarding the possibility of a Range II or Range III sentence based upon his prior criminal history. He said that he would have accepted the plea offer if he had realized he would get a ten-year sentence if his case went to trial. He agreed he did not want to accept the offer at the time it was conveyed to him. He did not recall if counsel advised him that he could be impeached with his prior burglary convictions if he testified at a trial. He said, however, that he knew the prosecutor would be allowed to question him about his record and that this could be damaging to his defense.

The Petitioner testified that he thought trial counsel had not effectively cross-examined Mr. Irwin, Jr. at the trial. The Petitioner said that he had not seen a photograph of him standing in the alley until the day of the trial and that it was an important component of the State's case. He said counsel should have questioned Mr. Irwin, Jr. and Mr. Crawford about why no security photographs of the Petitioner existed, other than the photograph of the Petitioner standing in the alley.

The Petitioner testified that Mr. Crawford, who had testified at the trial that he never saw the Petitioner inside of one of the Zip Products buildings, had been more truthful than Mr. Irwin, Jr.

Trial counsel testified that when she met with the Petitioner after she was appointed to represent him, he told her that he had worked for Zip Products about fifteen years earlier and that he had been "sleeping on the lot" on the date he was arrested. She said the Petitioner claimed to have known the owner of the business, whom she knew was Mr. Irwin, Sr., but she did not recall if the Petitioner claimed to have known Mr. Crawford. She said that the Petitioner told her about being held at gunpoint and being told to stay in a specified location but that she had not heard about racial epithets or his being "framed" until the Petitioner's post-conviction hearing testimony. She did not think the Petitioner's previous employment was significant in formulating a defense to a burglary charge. She said the Petitioner did not have permission to be on the property or inside a building. She said she had not understood the "makeup of where he was on the premises" until shortly before the trial, when she learned through her investigation that the premises had been locked. She said the three buildings sat inside an area that was secured by a gate and that the Petitioner was inside the secured area. She did not recall if she used the word "trespass" in asserting a defense that the Petitioner had trespassed on the property but had not burglarized a building. She said that Mr. Irwin, Jr. testified that he and Mr. Crawford saw the Petitioner pulling wire from the corner of a building.

Trial counsel testified that the Petitioner was released on bond for most of the time she represented him. She said that she did not meet with him at her office but that he had her contact information if he needed to speak with her. She said she asked him to call for an appointment but that he did not. She said she met with him on court dates. She said she provided the discovery materials to him on the day she was appointed. When asked if she reviewed them with him, she said, "I never saw him again." She also said she reviewed the discovery materials with him once he was returned to custody shortly before the trial. She acknowledged she talked to him generally about the State's proof but did not undertake a detailed review of the discovery with him. She said she did not receive the photographs that were used at the trial until shortly before the trial, possibly on the day of the trial.

Trial counsel testified that she listened to the recording of the preliminary hearing but did not have it transcribed because the evidence appeared to be straightforward. She did not think major inconsistencies existed in the witness accounts that were in the discovery materials, preliminary hearing recording, and official documents related to the arrest. She said that any inconsistencies which existed were not significant to a burglary charge.

Trial counsel testified that she discussed the plea offer with the Petitioner. She said she explained the risks of going to trial, rather than accepting the plea offer. She said the Petitioner was aware of his criminal history. She said her file reflected offers of four years at Range I and five years at Range II but no offer of three years. She said she told him that he faced a considerably longer sentence if he chose to go to trial. She said she told him the State's evidence against him was strong.

Trial counsel testified that the defense focused on whether the State proved that the Petitioner entered the building with the intent to commit a felony. She said Mr. Irwin, Jr. testified initially that he watched the Petitioner pull wire from the side of the building and later said he saw the Petitioner go inside the building. She did not recall if she cross-examined Mr. Irwin, Jr. about this inconsistency.

Trial counsel testified that a photograph of the Petitioner in the alley proved that he had been on the property but did not prove that he had entered a building.

Trial counsel testified that she went to the crime scene to view it and to take photographs. She said she did this before the Petitioner drew her a diagram of the scene. She said that the photographs she took "didn't really show a lot" and that, in her opinion, the witnesses' descriptions of the buildings provided sufficient information.

Trial counsel testified that she would have been unable to present evidence of the Petitioner's alleged prior employment with Zip Products without calling the Petitioner as a witness. She said that he never wanted to testify and that she "probably encouraged" him not to testify due to his prior criminal record.

Memphis Police Officer John Canter testified that on July 9, 2013, he responded to a complaint involving a man's taking wire from the back of a business's building. He said the original call had been "a fight call" involving the complainant holding someone at gunpoint. Officer Canter said the suspect was arrested at the scene but did not recall if he had been the arresting officer. He later said that Officer Joyce had prepared the arrest ticket and that Officer Joyce had resigned before the trial. Officer Canter said Officer Joyce moved to Texarkana but did not specify when. Officer Canter did not recall if he took witness statements. He recalled seeing "the alleged burglary items" at the scene but did not recall what they were. He said the arrest report stated that the police "responded to a burglary of a business." He said the dispatcher probably described the situation as a fight because she had information about a person being held at gunpoint but not about the burglary. He said he did not prepare the incident report, which stated the police had responded to "burglary of a building." When asked if the complainants mentioned vandalism of a building at the scene, Officer Canter said, "Not outside of what they had him at gunpoint for I don't believe."

Officer Canter testified that the Petitioner was between two buildings at the scene. He said that two warehouses were attached. He said, "The only way to get to where he was, was to have come though that vacant warehouse." Officer Canter said he was familiar with the Petitioner, whom he said he had encountered in the area of Zip Products on five or six other occasions.

After Officer Canter was excused, the post-conviction court advised counsel for the parties that it had received information that the Petitioner had attempted to contact Officer Canter in order to obtain a reduced sentence. After a recess, the prosecutor advised the court that he had spoken with Officer Canter and that the officer would try to locate "a writing that was sent to him purportedly from the [Petitioner]." At a later hearing, post-conviction counsel was allowed to withdraw, and substitute counsel was appointed. The record does not contain any further hearing regarding the alleged attempt to obtain a reduced sentence.

When the evidentiary hearing on the post-conviction petition was reconvened, trial counsel was recalled. When asked why she did not object when Mr. Irwin, Sr. testified at the trial that a police officer said, "Thomas, why are you here?" to the Petitioner at the scene, she said that although she could not say why she did not object, she probably thought the evidence was "not real relevant." She said, "[W]hen minor things are done in

a trial that aren't . . . real prejudicial, . . . you just kind of let them slide." She said she would not have moved for a mistrial if she did not have a reason to object.

When asked why she had mentioned in closing argument that Mr. Irwin, Jr. told the responding officers that the Petitioner went into a building, trial counsel testified that although her point probably was not clear, she was likely attempting to show that the witness had made inconsistent statements to the responding officers and a detective.

When asked to explain the point she had been making in closing argument when she said that the Petitioner had committed a crime but that it was not burglary, trial counsel testified that she was trying to argue that the offense committed was trespass. She said she never said, "It's a trespassing." She said she "would not be able to respond to" the question why she had not argued specifically that the jury should return a verdict of guilt to a lesser included offense of trespass, aggravated trespass, or attempted burglary. She noted that trials are "pressure packed" and said it appeared she "was making an argument for a trespass and . . . never completed the argument."

A transcript of the preliminary hearing was received as an exhibit.[1] The transcript reflects that Mr. Irwin, Jr. was asked, "At some point did [the Petitioner] go to exit your property?" and that Mr. Irwin, Jr. responded, "Yes, he did." When asked if this was inconsistent with Mr. Irwin, Jr.'s trial testimony that he stopped the Petitioner inside a building, trial counsel testified that she could understand how post-conviction counsel might think this but that it could mean that the Petitioner was stopped on the property but outside a building or that the Petitioner was stopped inside a building. She noted that the Petitioner had always been adamant that he did not go inside a building and that the preliminary hearing transcript did not make clear whether, in Mr. Irwin, Jr.'s account, the Petitioner had been inside a building. She said she had been under the impression going into the trial that the evidence would show the Petitioner never went inside a building. She did not know why she had not cross-examined Mr. Irwin, Jr. on this point. She said she did not see a basis for arguing that Mr. Irwin, Jr. lied under oath in order to support a claim that the prosecutor offered perjured testimony.

Mr. Irwin, Jr.'s pretrial statement was received as an exhibit. Trial counsel read the following from the statement:

> Me and three of my coworkers were eating lunch when I received a picture in my phone of this guy walking in between the buildings. Me and my dad ran out to the other building. I ran around the back side and my dad ran around the front. Mike Crawford, who also saw the picture, came

---

[1] The record reflects that the transcript was an unofficial version prepared by former post-conviction counsel. The State did not object to its being received as evidence at the post-conviction hearing.

around the back with me. At that point, there is a loading dock, which the guy jumped down in five feet to where he could get into the building on the back side of it. I observed him coming out of the building, and then he stopped and started ripping more wire off the side of the building. I waited for him to leave because he had to come past me to get out. Once I saw him, I told Mike I was going to draw my gun because I didn't want him to get too close to me because I didn't know if he had a weapon or not and I didn't want to shoot him. Once he came out, I drew my gun and I told him to get down and he complied and said, "Yes, sir." After I moved him inside the building, we waited there until the police got there.

Counsel agreed that a fair interpretation of Mr. Irwin, Jr., statement was that he pointed his gun at the Petitioner after the Petitioner came out of the building. She agreed that the statement could also be interpreted as meaning Mr. Irwin, Jr. pointed the gun at the Petitioner inside the building. She said the building was "huge that probably a tractor could go into" and had a "big door that's got a concrete slab on it." She said the concrete extended to the grass and explained, "You could say he stepped in the building when he stepped on the piece of concrete slab, but that doesn't necessarily mean he's actually in the structure itself." She did not know why she did not cross-examine Mr. Irwin, Jr. on this point, but she said, "[I]t sounds like I probably should have." She thought, however, that based upon the language of the burglary statute and the facts of the case, the State established the offense of burglary at trial.

Trial counsel testified that she was "sure" she advised the Petitioner not to testify based upon his criminal record. She said the Petitioner understood that he faced a greater sentence if he went to trial. She said that he was never interested in the four-year plea offer and that once he was released on bond, he was never interested in "taking any time."

Kevin Rardin, who prosecuted the Petitioner at the trial, testified that he did not recall any inconsistencies in Mr. Irwin, Jr.'s trial testimony, as compared with Mr. Irwin, Jr.'s pretrial statement and preliminary hearing testimony. Mr. Rardin was unsure whether he listened to the recording of the preliminary hearing but said his usual practice would have been to do so. He said he had no reason to think Mr. Irwin, Jr. testified falsely when he said he pointed a gun at the Petitioner inside a building. Mr. Rardin testified that, in his experience, witnesses recounted events differently each time. He said that if a witness has different details in recounting an event, it does not mean the witness is lying. He said he had no reason to believe Mr. Irwin, Jr. provided false testimony when he said wire and bolt cutters were found inside a building, as depicted in Trial Exhibit 3.

Timothy Irwin, Jr. testified that his trial testimony had been truthful when he said that he pulled a gun on the Petitioner inside Building 3 and that the Petitioner dropped the wire, bolt cutters, and glove inside the building. When asked about his pretrial statement, in which he said, "Once [the Petitioner] came out, I drew my gun," Mr. Irwin, Jr. said he had watched the Petitioner go in and out of the building several times during an approximate fifteen minutes. Mr. Irwin, Jr. said, "[O]nce he started to come out the last time, still in the building, is when I drew my gun. . . . He's at the edge of the building, inside the building."

Post-conviction counsel asked Mr. Irwin, Jr. to explain his preliminary hearing testimony, in which he said, "Once he got within about ten feet of me, I drew my pistol on him and I asked him to have a seat until the police get there." Mr. Irwin, Jr. testified that the Petitioner had been five feet inside the building and that Mr. Irwin, Jr. had been in the middle of a ten-foot-wide alley. Mr. Irwin, Jr. said the Petitioner "was going to exit the property and was headed in that direction, but . . . he was still inside the building." Mr. Irwin, Jr. said he stood between the Petitioner and the exit to the property. Mr. Irwin, Jr. said the Petitioner would have to walk through the alley to exit the property. Mr. Irwin, Jr. said the Petitioner and he walked parallel to each other, with the Petitioner on the concrete slab inside the building and Mr. Irwin, Jr. in the alley. Mr. Irwin, Jr. said the building was dilapidated and that most of the building's wall was missing. He said the photograph exhibit shown at trial of the wire on the concrete inside the building "is exactly where [the Petitioner] dropped everything, which is inside the confines of the building." Mr. Irwin, Jr. denied that he framed the Petitioner by "planting the evidence" on the concrete slab.

Mr. Irwin, Jr. testified that he had no memory of the Petitioner's having worked for Zip Products. He said their records from 1999 forward supported his recollection. He said that no one recalled the Petitioner's having worked for the company from 1970 to 1998, prior to electronic recordkeeping.

Memphis Police Lieutenant Curtis Price testified that he investigated the burglary underlying the Petitioner's conviction. Lieutenant Price said that Mr. Irwin, Jr. told him that Mr. Irwin, Jr. saw the Petitioner "breaking into the building and cutting the wire from the wall." Lieutenant Price said Mr. Irwin, Jr. stated he had seen the Petitioner inside the building. Lieutenant Price said that his memory of Mr. Irwin, Jr.'s interview at the police station was consistent with the written statement, which states, "Once he came out, I drew my gun."

Memphis Police Officer Carolyn Woods testified that she transported the Petitioner to the police station. She said she did not interview witnesses. She said she did not write the narrative in the affidavit of complaint and acknowledged her signature

on the document, indicating she "swore that affidavit out." She said a sergeant would have written the narrative.

Memphis Police Officer John Canter was recalled and testified that he had no recollection of whether Mr. Irwin, Jr. told him at the scene that Mr. Irwin, Jr. had seen the Petitioner go inside one of the buildings. Officer Canter said he would not have written the narrative on the arrest ticket or the affidavit of complaint. When asked who would have written in a "report" that the point of entry had been a rear window and that the point of exit had been a side window, he said Officer Joyce would have written this as the reporting officer. Officer Canter said that when he arrived at the scene, the bolt cutters were with the Petitioner, who was sitting on a crate inside "the main [b]uilding that they worked out of," which he said was on the right when he pulled into the parking lot. He said the Petitioner and the wire cutters were not inside the same building where the burglary occurred.

Memphis Police Officer Joshua Davis testified that he had responded to the scene. He did not recall whether any witnesses stated they had seen the Petitioner go inside any buildings. Officer Davis recalled that when he arrived, he parked between two buildings and went into the one on the right, where Zip Products personnel had detained the Petitioner. Officer Davis did not recall whether the bolt cutters were next to the Petitioner. Officer Davis said Officer Joyce would need to explain the portion of the report specifying the Petitioner's point of entry and point of exit.

The Petitioner was recalled and testified that the prosecutor offered perjured testimony at the Petitioner's trial. The Petitioner stated that the perjured testimony consisted of Mr. Irwin, Jr.'s statement that Trial Exhibit 3 depicted the location in Building 3 where Mr. Irwin, Jr. pulled a gun on the Petitioner and made the Petitioner drop bolt cutters, wire, and gloves. The Petitioner said the photograph deceived the jury into believing he was inside Building 3.

The Petitioner testified that trial counsel should have obtained a defense expert to examine the bolt cutters to show that they were not operational or were rusty. He said counsel failed to call police officers as trial witnesses and that they could have "shined some light on that affidavit." He said that someone had falsified the affidavit because it stated the case was "inactive," which he said meant that insufficient evidence existed.

The Petitioner identified drawings he made of the Zip Products property and buildings. He testified that the arrest report and affidavit of complaint listed the address of the burglarized building as 1590 Texas Street but that he was convicted at the trial of burglarizing the building at 1610 Texas Street. He agreed that the indictment stated he had burglarized Zip Products and did not specify an address.

The Petitioner testified that when he was about to leave the alley between the buildings on the date of the offense, Mr. Irwin, Jr. and Mr. Crawford pulled a gun on him and told him to drop everything and raise his hands. The Petitioner said that the other men jumped off a ramp, that Mr. Irwin, Jr. told Mr. Crawford to hold the Petitioner at gunpoint, and that Mr. Irwin, Jr. walked to the location where the bolt cutters lay. The Petitioner said Mr. Irwin, Jr. kicked the bolt cutters out of the ground, picked them up, and escorted the Petitioner into Building 2 with Mr. Crawford. The Petitioner said Mr. Crawford held him at gunpoint until the police arrived. The Petitioner said Mr. Irwin, Jr. "walk[ed] . . . back out with the bolt cutters."

The trial transcript was received as an exhibit.

The post-conviction court denied relief in a written order. This appeal followed.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2018). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2018). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent

assistance." *Strickland*, 466 U.S. at 690.  A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008).  This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

# I

## Failure to Object and to Request a Mistrial

The Petitioner contends that the post-conviction court erred in denying relief on the basis that trial counsel was ineffective for failing to object and to request a mistrial when Mr. Irwin, Jr. testified that a police officer knew the Petitioner by name.  The State counters that the court did not err in denying relief because the Petitioner failed to prove his claim.  We agree with the State.

The trial transcript reflects that Mr. Irwin, Jr. was asked what happened when the police arrived at the scene, to which he responded, "[O]ne of the officers knew [the Petitioner] by name and he said, Thomas, why are you over here.  And he said I don't know.  And then they searched him and found tin snips or wire cutters in his pocket."

At the post-conviction hearing, trial counsel did not recall why she had not objected to the evidence.  She said, however, that it was insignificant and that she had learned the better strategy was to let things of this nature "slide" rather than calling the jury's attention to them.  She said that without a basis for objection, she would not have moved for a mistrial.  The post-conviction court found that counsel made a strategic decision, based on her experience, not to "draw more attention to" the testimony.

The Petitioner argues that the evidence "would have caused the jury to believe that Petitioner was frequently in trouble with the law."  He argues that this evidence was essentially other crimes, wrongs, or acts evidence, the admission of which is subject to Tennessee Rule of Evidence 404(b), and that the probative value of the evidence was outweighed by the danger of unfair prejudice, such that its admission was barred by Tennessee Rule of Evidence 403.

The record supports the post-conviction court's determination.  The jury heard evidence that an officer knew the Petitioner's name.  No evidence was adduced regarding

-13-

the Petitioner's prior criminal history or further information about the nature of their acquaintance. Based upon her experience, trial counsel elected not to object in order to minimize the jury's focus on the evidence, and because she did not have a compelling basis for an objection, she likewise lacked a basis for moving for a mistrial. The record supports the post-conviction court's conclusion that the Petitioner failed to prove that counsel's performance was deficient. In addition, the record supports the court's determination that the Petitioner failed to prove prejudice. The evidence was brief and insignificant in light of eyewitness testimony of the Petitioner's having committed the offense. The post-conviction court did not err in denying relief on this basis.

## II

## Impeachment with Prior Statements

The Petitioner contends that the post-conviction court erred in denying relief on his claim that trial counsel was ineffective because she did not impeach Mr. Irwin, Jr. with his prior inconsistent statements from his pretrial statement to Detective Price and his preliminary hearing testimony. The State counters that counsel was not ineffective because Mr. Irwin, Jr.'s prior statement and testimony could be explained and might be used to bolster his testimony, had counsel attempted to impeach him. We agree with the State.

We have reviewed Mr. Irwin, Jr.'s pretrial statement, his testimony as reflected in the preliminary hearing transcript prepared by former post-conviction counsel, and his trial testimony. In the pretrial statement that Mr. Irwin, Jr. gave to Detective Price, Mr. Irwin, Jr. said the Petitioner had been inside one of the buildings stealing wiring. At the preliminary hearing, Mr. Irwin, Jr. was not asked specifically, nor did he say specifically, that the Petitioner had been inside a building. His testimony at the preliminary hearing is fairly characterized as ambiguous as to whether the Petitioner was inside a building. At the trial, Mr. Irwin, Jr. testified that he had seen the Petitioner inside a building.

Mr. Irwin, Jr. testified at the post-conviction hearing that the Petitioner had been inside Building 3. When asked at the post-conviction hearing to explain his preliminary hearing testimony, he stated that the Petitioner had been inside the building, which was missing some of its walls, and that Mr. Irwin, Jr. had walked in the alley parallel to the Petitioner as the Petitioner moved to exit the building.

Trial counsel did not recall at the post-conviction hearing why she had not cross-examined Mr. Irwin, Jr. regarding possible inconsistencies in his pretrial statement, his preliminary hearing testimony, and his trial testimony. The trial transcript reflects that, in closing argument, counsel attacked the State's proof that the Petitioner had been inside a building. She argued that Mr. Irwin, Jr. did not testify that the Petitioner had been inside

a building until he was specifically asked by the prosecutor. She argued that Mr. Crawford never testified that he saw the Petitioner inside a building and that the incident report and arrest ticket did not state that the Petitioner had been inside a building because no one at the scene gave this information to Officer Canter. She argued that Mr. Irwin, Jr. did not say in his statement to Detective Price that the Petitioner had been inside a building.

Mr. Irwin, Jr.'s preliminary hearing testimony was ambiguous relative to whether the Petitioner was inside a building. Notably, he did not say that the Petitioner never entered a building; rather, he merely was not asked and did not say, specifically, that the Petitioner was inside a building. Mr. Irwin, Jr.'s pretrial statement and his trial testimony directly addressed the point and placed the Petitioner inside a building. Mr. Irwin, Jr.'s post-conviction hearing testimony clarified his preliminary hearing testimony and placed the Petitioner inside the building. Had trial counsel cross-examined him at the trial, Mr. Irwin, Jr. would have had the opportunity to clarify the prior testimony and reiterate his previous trial testimony that the Petitioner had been inside the building, thereby emphasizing the disputed fact that was essential to the burglary charge.

Although trial counsel had no recollection of her decision-making process in not cross-examining Mr. Irwin, Jr. on the preliminary hearing testimony, the record supports the post-conviction court's determination that she did not perform deficiently. Mr. Irwin, Jr.'s trial testimony placed the Petitioner inside Building 3. Had counsel attempted to impeach him with his ambiguous preliminary hearing testimony, she would have provided him with the opportunity to clarify, as he did in his post-conviction hearing testimony, and thereby further emphasize his testimony regarding the Petitioner's presence inside the building. Instead of taking this risk, counsel utilized closing argument to attack the State's proof regarding the Petitioner's presence in the building. We conclude, as well, that the record supports the post-conviction court's determination that the Petitioner was not prejudiced by counsel's lack of cross-examination of Mr. Irwin, Jr. relative to his pretrial statement and preliminary hearing testimony. As we have stated, Mr. Irwin, Jr.'s post-conviction hearing testimony shows that he would have been able to clarify and further emphasize his assertion that the Petitioner was inside the building. The post-conviction court did not err in denying relief. The Petitioner is not entitled to relief on this basis.

### III

### Failure to Call a Police Officer as a Witness

The Petitioner contends that trial counsel provided ineffective assistance because she did not call Lieutenant Price as a trial witness. He argues that counsel should have questioned Lieutenant Price about Mr. Irwin, Jr.'s pretrial statement, which the Petitioner

argues "could be read to mean that [Mr. Irwin, Jr.] stopped the Petitioner outside of the building, which would have been inconsistent with his trial testimony." The State responds that Mr. Irwin, Jr.'s pretrial statement was not inconsistent and, therefore, was inadmissible pursuant to Tennessee Rules of Evidence 613 and 803(26). The State also argues that impeachment on when the Petitioner stepped outside the building would not have adversely affected Mr. Irwin, Jr.'s testimony that he saw the Petitioner inside Building 3. We conclude that the Petitioner is not entitled to relief.

Lieutenant Price testified at the post-conviction hearing that Mr. Irwin, Jr. stated that Mr. Irwin, Jr. had seen the Petitioner inside the building. The post-conviction court found that if trial counsel had called Lieutenant Price as a trial witness, his testimony "would have likely corroborated [Mr.] Irwin, Jr.'s testimony." The court found that the Petitioner failed to establish prejudice because Lieutenant Price's testimony would have "corroborated the events or would be unhelpful in establishing inconsistencies" in Mr. Irwin, Jr.'s testimony.

The Petitioner's argument focuses on a portion of Mr. Irwin, Jr.'s pretrial statement, which the Petitioner argues "could be read to mean that [Mr. Irwin, Jr.] stopped Petitioner outside of the building." He argues that this could have been used to impeach Mr. Irwin, Jr.'s trial testimony that he stopped the Petitioner while the Petitioner was inside Building 3, which would have demonstrated that Mr. Irwin, Jr. was an unreliable witness.

The question of where the Petitioner was when Mr. Irwin, Jr. confronted him was insignificant, as compared with the question of whether the Petitioner was inside the building at any point during his attempt to steal wiring. Even if trial counsel had called Lieutenant Price as a witness and the trial court had allowed his testimony regarding collateral evidence of an allegedly inconsistent prior statement, impeachment of Mr. Irwin, Jr.'s testimony on a non-material point would have been insignificant in the face of Mr. Irwin, Jr.'s trial testimony that he saw the Petitioner cutting wiring inside Building 3. The record reflects that counsel cross-examined Mr. Irwin, Jr. about the facts of the case. At the post-conviction hearing, Mr. Irwin, Jr. explained the purported inconsistencies in his pretrial statement and his trial testimony. The record supports the post-conviction court's findings that the Petitioner failed to prove that counsel's performance was deficient and that the Petitioner was prejudiced. The post-conviction court did not err in denying relief on this basis.

## IV & V

## Closing Argument

-16-

The Petitioner contends that trial counsel was ineffective because she stated in closing argument that Mr. Irwin, Jr. gave a pretrial statement to Lieutenant Price in which he said the Petitioner had entered a building, even though the statement had not been admitted as evidence. The Petitioner also contends that trial counsel was ineffective in closing argument because she failed to ask the jury to consider a specific lesser included offense of burglary. The State counters that the post-conviction court did not err in denying relief on these claims. We agree with the State.

1.     **Closing Argument Regarding Mr. Irwin, Jr.'s Pretrial Statement**

At the post-conviction hearing, trial counsel testified that she mentioned Mr. Irwin, Jr.'s pretrial statement in her closing argument because she was trying to highlight inconsistencies in the State's evidence. The trial transcript reflects that she asked Mr. Irwin, Jr. if he gave a statement to the police after the incident and that he acknowledged he had. The transcript reflects, however, that she did not ask him about the contents of the statement and that the statement was not received as evidence. In closing argument, counsel argued that the arrest ticket and the incident report did not contain "a mention that [the Petitioner] entered that building." She also argued relative to Mr. Irwin, Jr.'s pretrial statement

> Now, in that statement he does say that [the Petitioner] entered the building when he was asked. But at the time this event occurred within that same few minutes, there was never a mention that [the Petitioner] entered that building. And I need for you to think about why.
>
> Ladies and gentlemen, I contend today [the Petitioner] didn't enter that building. His acts occurred on the outside of that building.

The Petitioner faults trial counsel for referring to the content of the statement in her closing argument because his defense was that he never entered the building. At the time counsel made the argument, the jury had heard Mr. Irwin, Jr.'s testimony that he saw the Petitioner in Building 3. We acknowledge that counsel's argument referred to facts which were not in evidence, to the extent that she based her argument on the contents of Mr. Irwin, Jr.'s pretrial statement. The post-conviction court found, however, that counsel's closing argument was a strategic decision to point out inconsistencies in the State's evidence and that it was based upon information and adequate preparation. The record supports the court's determination. Counsel utilized closing argument to challenge the State's proof regarding the Petitioner's presence in a Zip Products building. Given the Petitioner's undisputed presence on the business's property, counsel pursued a reasonable defense strategy of attempting to avoid a finding of guilt for the burglary charge by defending against the State's proof that he had been inside a building. We conclude that the record supports the post-conviction court's determination that the

-17-

Petitioner failed to prove ineffective assistance of counsel.  The Petitioner is not entitled to relief on this basis.

## 2.    Failure to Request a Verdict on a Specific Lesser Included Offense

The Petitioner contends that the post-conviction court erred in denying relief on his claim that trial counsel provided ineffective assistance because she failed to request that the jury return a verdict of one of the lesser included offenses of burglary:  attempted burglary, aggravated criminal trespass, attempted aggravated criminal trespass, or criminal trespass.   The Petitioner has not identified which one of these offenses, specifically, he contends counsel should have argued.  The State responds that the court did not err in denying relief because counsel's argument advanced the theory that the Petitioner was guilty of one of the lesser included offenses but not of burglary.  We agree with the State.

The trial transcript reflects that trial counsel argued in her closing argument that the Petitioner did not enter a Zip Products building.  She acknowledged that she could not state that the Petitioner had not committed a criminal act but that she could state he did not commit a burglary. She acknowledged that he had been on the property without consent but said he had not entered a building.

The post-conviction court found that despite trial counsel's not having requested a verdict on a specific lesser included offense, she had not performed deficiently in arguing the Petitioner had not committed a burglary and that she effectively told the jury to consider the lesser included offenses.  Counsel made an argument based upon the limited options available to her given the facts of the case.  She advanced the theory that the Petitioner was not guilty of the most serious offense and was, instead, guilty of one of the lesser included offenses.  The trial transcript reflects that the jury was instructed on the charged offense and its lesser included offenses and that it should consider the charged offense first and proceed sequentially to the lesser included offenses in order from greatest to least only if it found the Petitioner was not guilty of the greater offense.  We conclude that the record supports the post-conviction court's denial of relief.

## VI

## Cumulative Effect of Instances of Deficient Performance

Finally, the Petitioner contends that he is entitled to post-conviction relief because he received the ineffective assistance of counsel due to multiple instances of deficient performance, the cumulation of which resulted in prejudice.  The post-conviction court rejected each of the Petitioner's individual allegations of error, and we have determined that the record supports the court's determination in each instance.  The record reflects

that trial counsel did not object when doing so would have called attention to the evidence, did not move for a mistrial without an adequate basis for the motion, did not present evidence that might have advanced the State's theory of the Petitioner's guilt, did not impeach Mr. Irwin, Jr. in a way that might have backfired to the Petitioner's detriment, and made a closing argument that advanced a theory that the Petitioner was not guilty of the most serious charge. The Petitioner failed to demonstrate at the hearing that, had counsel employed different trial strategy, a reasonable probability exists that he would have obtained a different result. We conclude that the Petitioner is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE